## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| **CONNECTICUT PARENTS UNION**, <br><br> Plaintiff, <br><br> v. <br><br> **DIANNA WENTZELL**, in her official capacity as Commissioner, Connecticut State Department of Education; **ALLAN B. TAYLOR**, in his official capacity as Chairperson of the Connecticut State Department of Education's Board of Education; **NED LAMONT**, in his official capacity as Governor of Connecticut; **WILLIAM TONG**, in his official capacity as Connecticut Attorney General, <br><br> Defendants. | Civil Action No. _____ <br><br><br> FEBRUARY 20, 2019 <br><br><br><br> Jury Trial Demanded |

## CIVIL RIGHTS COMPLAINT FOR
## DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff Connecticut Parents Union brings this civil rights lawsuit for declaratory and injunctive relief to vindicate the rights of Connecticut school children to receive a quality education regardless of the color of their skin, and alleges as follows:

### INTRODUCTION

1.     Under Connecticut law, students are being turned away from the State's best schools simply because they have the wrong skin color. Connecticut law mandates that its world-class interdistrict magnet schools reserve at least 25% of its seats for white and Asian students. Conversely, it caps interdistrict magnet school

enrollment of Black and Hispanic students at 75%. This hard racial quota is an unconstitutional outgrowth of litigation involving Hartford schools. *See Sheff v. O'Neill*, 238 Conn. 1 (1996). *Sheff* is in fact limited to *Hartford*-area public schools and does not apply to schools outside of the Hartford area. *Id.* at 24. Accordingly, the 75% cap on Black and Hispanic enrollment—adopted through the settlement negotiations that followed *Sheff*—applies only to *Hartford* schools. The State bypassed this important distinction when it decided to expand the racial quota in 2017 to create uniform racial quotas for interdistrict magnet schools statewide.

2.      The statewide racial quota has already wrought serious harm on these non-Hartford interdistrict magnet schools and their students. In New Haven, for example, an interdistrict magnet high school that enrolled 91% Black and Hispanic students was forced to shut its doors last spring under the threat of more than $100,000 in penalties for failing to maintain the racial quota.[1] The racial quota pushes students into Connecticut's failing neighborhood schools and robs them of an opportunity to have a better life and brighter future.

3.      Today, Connecticut Parents Union, an organization committed to advocating for the educational rights of children in Connecticut, challenges the statewide racial quota on the grounds that it violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. The Equal Protection Clause prohibits state-based discrimination on the basis of race unless such a law can

---

[1] Brian Zahn, *New Haven school board votes to close Creed High School, 2 alternative schools*, New Haven Register (May 15, 2018), https://www.nhregister.com/news/article/New-Haven-school-board-votes-to-close-Creed-High-12914404.php (last accessed Feb. 19, 2019.)

stand up to the strictest constitutional scrutiny. The Connecticut Parents brings this lawsuit to ensure that racial discrimination against the Black and Hispanic children of Connecticut is ended.

### JURISDICTION AND VENUE

4.     This action arises under the Fourteenth Amendment to the United States Constitution, 42 U.S.C. §§ 1981 & 1983. The Court has jurisdiction over these federal claims under 28 U.S.C. § 1331 (federal question) and § 1343(a) (redress for deprivation of civil rights). Declaratory relief is authorized by the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202.

5.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), as Defendants are residents of this judicial district and the State of Connecticut. Venue is proper in this Court under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claim occurred or will occur in this judicial district.

### PARTIES

#### _Plaintiff_

#### _Connecticut Parents Union_

6.     The CONNECTICUT PARENTS UNION (CTPU) was established to ensure that "parents, guardians, and families are connected with the educational resources and support system necessary to protect their children's educational rights thus ensuring that neither race, zip-code, nor socio-economic status is a predictor of a child's success." Founded by current president Gwendolyn Samuel in 2011, CTPU collaborates with parents, teachers, and educational advocates across Connecticut to

engage decision-makers to achieve educational reform. CTPU has hosted community events, information sessions, bus tours, and other events in order to educate the public about the statewide racial quota's harmful effects on Connecticut's interdistrict magnet schools and students. CTPU has led, and continues to lead, legislative-reform efforts to repeal the racial quota.

### *Defendants*

### *Connecticut State Department of Education*

7.  DIANNA WENTZELL is the Commissioner[2] of the Connecticut State Department of Education (Department of Education or Department). Dr. Wentzell is sued in her official capacity. The Department of Education serves "as the administrative arm of the State Board of Education." Conn. Gen. Stat. § 10-3*a*(a). The Department is "under the direction" of the Commissioner of Education, who "shall be the administrative officer of the department and shall administer, coordinate and supervise the activities of the department in accordance with the policies established by the board." *Id.* The appointment of the Commissioner is recommended by the Board of Education to the Governor, for a term of four years to be coterminous with the term of the Governor. *Id.* The Commissioner of Education is responsible for, among other things, developing the "reduced-isolation setting standards for interdistrict magnet school programs" that are the subject of this litigation. *Id.* § 10-264*l*(a).

---

[2] Pursuant to Connecticut General Statute § 10-2(b), whenever "the term the secretary to the State Board of Education occurs or is referred to in the general statutes, it shall be deemed to mean or refer to the Commissioner of Education."

### Connecticut State Board of Education

8.     ALLAN B. TAYLOR is Chair of Connecticut's State Board of Education and is sued in his official capacity. The Connecticut State Board of Education has "general supervision and control of the educational interests of the state." Conn. Gen. Stat. § 10-4(a). Among other things, the State Board "shall ensure that all interdistrict educational programs and activities receiving state funding are conducted in a manner that promotes a diverse learning environment[,]" and it "may establish reasonable enrollment priorities to encourage such programs and activities to have racially, ethnically and economically diverse student populations." *Id.* § 10-276*b*. In addition, the Board of Education is obligated to "organize the Department of Education into such bureaus, divisions and other units as may be necessary for the efficient conduct of the business of the department." *Id.* § 10-3*a*(b). The Board has "general supervision and control of the educational interests of the state," including elementary education. *Id.* § 10-4(a).

### Connecticut State Officials

9.     NED LAMONT is the Governor of Connecticut and is sued in his official capacity. As governor, he is vested with the "supreme executive power of the state." Conn. Gen. Stat. § 3-1. Among other things, the governor is responsible for appointing, with the advice and consent of the Connecticut General Assembly, the members of the State Board of Education, and the governor selects one Board member as chair. *Id.* §§ 10-1(b), 10-2(a). The Governor appoints the Commissioner of

Education, upon recommendation by the Board of Education, for a term of four years to be coterminous with the term of the Governor. *Id*. § 10-3(a).

10.    WILLIAM TONG is Attorney General for the State of Connecticut and is sued in his official capacity. The Attorney General has "general supervision over all legal matters in which the state is an interested party." Conn. Gen. Stat. § 3-125.

FACTUAL ALLEGATIONS

### *Legislative response to* Sheff *decision*

11.    The Connecticut Supreme Court ruled that the Connecticut Constitution required the State to provide the schoolchildren of Hartford and surrounding suburban public schools with a "substantially equal educational opportunity," and that a significant component of that requirement was access to schools that were "not substantially impaired by racial and ethnic isolation." *Sheff v. O'Neill*, 238 Conn. 1, 24 (1996). The *Sheff* settlement negotiations resulted in, among other things, a racial quota, which required interdistrict magnet schools in and around Hartford to cap Black and Hispanic student enrollment at 75%.

12.    In response to the *Sheff* decision, the Connecticut Legislature approved Public Act 97-290, "An Act Enhancing Educational Choices and Opportunities," requiring Connecticut school boards to reduce racial, ethnic, and economic isolation by various methods, including the creation of interdistrict magnet school programs.

### *Connecticut's Race-Based Quota System*

13.    In 2017, the Connecticut Legislature enacted Public Act 17-172, which applied the *Sheff* racial quota to all interdistrict magnet schools throughout

6

Connecticut.[3] Public Act 17-172 amended Conn. Gen. Stat. § 10-264*l*(a) and authorized the Commissioner to create "reduced-isolation" standards, under which all interdistrict magnet schools must maintain a minimum percentage of "reduced-isolation" students. The Act also authorized the Commissioner to define the term "reduced-isolation student."

14.     The decision to extend the racial quota to all magnet schools in the state was not required to comply with the *Sheff* decision.

15.     On October 23, 2017, the Commissioner issued reduced-isolation standards. A true and correct copy of this regulation is included as Exhibit 1. The standards require interdistrict magnet schools throughout Connecticut to ensure that at least 25% of their enrollment is comprised of "reduced-isolation students."[4] The Commissioner defined a "reduced-isolation student" to be anyone who is "any combination other than Black/African American or Hispanic." Under the Commissioner's October 23, 2017 standards, "reduced-isolation" students—white and Asian students—must make up at least 25% of each interdistrict magnet school's enrollment. This standard in effect creates a 75% cap on Black and Hispanic students at every interdistrict magnet school in Connecticut. Accordingly, under the statewide

---

[3] *See* Connecticut General Assembly, Office of Legislative Research, State of Connecticut, https://www.cga.ct.gov/2017/BA/2017HB-07201-R01-BA.htm (last accessed Feb. 19, 2019).

[4] Under the Commissioner's standards, non-*Sheff* interdistrict magnet schools operating prior to July 1, 2005 have until the 2021–22 school year to comply with the racial quota requiring 25% minimum enrollment of white and Asian students, while non-*Sheff* interdistrict schools operating after July 1, 2005 were immediately subject to the racial quota requiring 25% minimum enrollment of white and Asian students. In addition, the Commissioner adopted the negotiated, court-ordered *Sheff* quota for Hartford-area schools, which required a 25% minimum enrollment of white and Asian students.

quota, Black and Hispanic students—and only Black and Hispanic students—are restricted from enrolling in Connecticut interdistrict magnet schools above a 75% "reduced isolation" enrollment cap.

16.     In the mere two years it has been in place, the statewide quota has already hurt interdistrict magnet schools and their students. The fate of Dr. Cortlandt V.R. Creed Health & Sports Sciences High School, a former interdistrict magnet high school in New Haven, reveals the harmful impacts of the statewide quota on both individuals and communities of color. For failing to maintain the mandated 75% cap on Black and Hispanic student enrollment, Creed faced sanctions in excess of $100,000. As a result, Creed was forced to shut down.

17.     Named for Cortlandt Creed, the first Black graduate of Yale Medical School, Creed High School was by all accounts popular, successful, and academically challenging. But because it made the mistake of teaching "too many" Black and Hispanic students (who made up 91% of the school's enrollment), Creed was forced to close its doors. As New Haven Board of Education Member Edward Joyner put it, "*Sheff* was supposed to be a remedy. Now, it's become a penalty."[5]

### *Injunctive Relief Allegations*

18.     Plaintiff incorporates and re-alleges each and every allegation contained in the preceding paragraphs of this Complaint.

---

[5] Brian Zahn, New Haven school board votes to close Creed High School, 2 alternative schools, New Haven Register (May 15, 2018), https://www.nhregister.com/news/article/New-Haven-school-board-votes-to-close-Creed-High-12914404.php (last accessed Feb. 19, 2019.)

19.     Defendants are responsible for enforcing and/or implementing the 75% cap on Black and Hispanic students in Connecticut's interdistrict magnet schools.

20.     The mission of Plaintiff CTPU is to advocate for equal educational opportunity for all children in Connecticut. Defendants' 75% cap on Black and Hispanic enrollment in Connecticut interdistrict magnet schools continues to prevent CTPU from fulfilling its mission to prevent children's skin color from determining their educational opportunities.

21.     Under the statewide racial quota, Black and Hispanic students are denied admission to interdistrict magnet schools in favor of white and Asian students.

22.     This overt discrimination stands in direct opposition to the ability of CTPU to successfully perform its mission, as it compels CTPU to expend a significant amount of time and resources opposing the unconstitutional cap on Black and Hispanic students, at the expense of advancing and promoting other education reforms.

23.     Because of the racial quota, Plaintiff is now and will continue to suffer specific and redressible injury.

24.     If not enjoined by this Court, Defendants and their agents, representatives, and employees will continue to discriminate against children on the basis of race, in contravention of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

25.     Pecuniary compensation to Plaintiff or other victims of such continuing discrimination would not afford adequate relief.

26.    Injunctive relief is necessary to prevent a multiplicity of judicial proceedings on these same or similar issues.

27.    Accordingly, permanent injunctive relief is appropriate and proper.

### *Declaratory Relief Allegations*

28.    Plaintiff incorporates and re-alleges each and every allegation contained in the preceding paragraphs of this Complaint.

29.    An actual and substantial controversy currently exists between Plaintiff CTPU and Defendants as to their respective legal rights and duties.

30.    Plaintiff contends that Defendants are discriminating on the basis of race in violation of the Fourteenth Amendment to the United States Constitution. Defendants dispute that their actions are unconstitutional.

31.    There exists a present justiciable controversy between the parties concerning the constitutionality and legality of the 75% cap on Black and Hispanic students who may attend Connecticut's interdistrict magnet schools.

32.    Plaintiff will be directly, adversely, and irreparably harmed by Defendants' actions in enforcing and implementing the racial quota, and by Defendants' continuing administration, implementation, reliance, and enforcement of them now and in the future.

33.    A judicial determination of rights and responsibilities arising from this actual controversy is necessary and appropriate at this time.

## CLAIM FOR RELIEF

### The 75% Minority Cap Violates the Equal Protection Clause of the Fourteenth Amendment

34.     Plaintiff incorporates and re-alleges each and every allegation contained in the preceding paragraphs of this Complaint.

35.     Defendants acted and continue to act under color of state law in developing, implementing, and administering the 75% cap on Black and Hispanic students who may attend Connecticut interdistrict magnet schools.

36.     The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution requires that, "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV, § 1. All governmental action based on race must be subjected to strict judicial scrutiny to ensure that no person is denied equal protection of the laws.

37.     Defendants' 75% cap on Black and Hispanic enrollment in Connecticut interdistrict magnet schools specifically injures Plaintiff CTPU, because it disrupts its express mission to advocate on behalf of equal educational opportunity for all children in Connecticut.

38.     Under the racial quota, Black and Hispanic students are denied admission to interdistrict magnet schools in favor of white students. This overt discrimination stands in direct opposition to the ability of CTPU to successfully perform its mission, as it compels CTPU to expend time and resources fighting this unconstitutional policy, at the expense of advancing and promoting educational reforms.

39.    The Defendants' actions in enforcing and administering the 75% cap on Black and Hispanic enrollment are not narrowly tailored to achieve a compelling state interest.

40.    Limiting Black and Hispanic children from attending Connecticut's elite interdistrict magnet schools serves no compelling state interest.

41.    Defendants' cap on Black and Hispanic student enrollment is not required to remedy past, intentional, *de jure* discrimination.

42.    Defendants' cap on Black and Hispanic student enrollment is not required to secure the educational benefits that flow from racial diversity in higher education.

43.    Defendants' statewide cap on Black and Hispanic enrollment is not required as a result of the Connecticut Supreme Court decision in *Sheff v. O'Neill*, 238 Conn. 1 (1996).

44.    Defendants' cap on Black and Hispanic enrollment does not serve a compelling state interest, because Defendants have not first determined that race-based measures are necessary to achieve a compelling governmental interest.

45.    The Defendants' actions in enforcing and administering the cap on Black and Hispanic student enrollment at the State's interdistrict magnet schools are not narrowly tailored to a compelling state interest, because Defendants cannot prove that a non-racial approach would fail to promote the government objective as well, at a tolerable administrative expense.

46.     The Defendants' actions in enforcing and administering the 75% cap on Black and Hispanic enrollment at interdistrict magnet schools are not narrowly tailored to a compelling state interest, because Defendants failed to exhaust race-neutral alternatives before resorting to race-based classifications.

\* \* \*

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff requests the following relief:

1.     A declaratory judgment, pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, from the Court, that the 75% cap on Black and Hispanic student-enrollment in Connecticut's interdistrict magnet schools, which significantly restricts the number of Black and Hispanic children who may attend interdistrict magnet schools within the State, enforced and administered by the Defendants, is unconstitutional, illegal, invalid, and unenforceable, because it discriminates on the basis of race and denies individuals equal protection of the laws in violation of the Fourteenth Amendment to the United States Constitution and federal civil rights statutes 42 U.S.C. §§ 1981 and 1983;

2.     A permanent prohibitory injunction enjoining Defendants, their agents, employees, officers, and representatives from adopting, enforcing, attempting, or threatening to enforce the 75% cap on Black and Hispanic students who may attend interdistrict magnet schools in the State of Connecticut, insofar as it discriminates on the basis of race and denies individuals equal protection of the laws in violation of

the Fourteenth Amendment to the United States Constitution and federal civil rights statutes 42 U.S.C. §§ 1981 and 1983;

3.     A permanent injunction prohibiting Defendants from using race in future interdistrict magnet school enrollment decisions;

4.     Attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and any other applicable legal authority; and

5.     All other relief this Court finds just and proper.


* * *


**JURY DEMAND**

Plaintiff demands a jury trial on all issues so triable.


* * *

DATED: February 20, 2019.        Respectfully submitted,

                        /s/ Scott Sawyer
                        SCOTT SAWYER, Conn. Bar. No. 411919
                        SAWYER LAW FIRM
                        The Jill S. Sawyer Building
                        251 Williams Street
                        New London, CT 06320
                        860.442.8131 (Telephone)
                        860.442.4131 (Fax)
                          scott@sawyerlawyer.com

                        JOSHUA P. THOMPSON, Cal. Bar No. 250955*
                        OLIVER J. DUNFORD, Cal. Bar No. 320143*
                        TIMOTHY R. SNOWBALL, Cal. Bar No. 317379*
                        MOLLIE WILLIAMS, Cal. Bar No. 322970*
                        PACIFIC LEGAL FOUNDATION
                        930 G Street
                        Sacramento, CA 95814
                        916.419.7111 (Telephone)
                        916.419.7747 (Fax)
                          JThompson@pacificlegal.org
                          ODunford@pacificlegal.org
                          TSnowball@pacificlegal.org
                          MWilliams@pacificlegal.org

                        Counsel for Plaintiffs

                        *Motions for Pro Hac Vice Admission to be filed

15