UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| CONNECTICUT PARENTS UNION,<br>    Plaintiff,<br><br>         v.<br><br>DIANNA WENTZELL, et al.,<br>    Defendants. | No. 3:19-cv-247 (SRU) |

**RULING ON MOTION TO DISMISS**

The Connecticut Parents Union ("CTPU") filed the instant suit against Dianna Wentzell, in her official capacity as Commissioner of the Connecticut State Department of Education; Allan B. Taylor, in his official capacity as Chairperson of the Connecticut State Department of Education's Board of Education; Ned Lamont, in his official capacity as Governor of Connecticut; and William Tong, in his official capacity as Connecticut Attorney General (collectively, "Defendants").  As set forth in its complaint, CTPU claims that Connecticut's statewide racial quota for interdistrict magnet schools violates the Equal Protection Clause of the Fourteenth Amendment.

Defendants have moved to dismiss CTPU's complaint on the ground that CTPU lacks standing.  For the reasons that follow, Defendants' motion is **granted.**

**I.      Standard of Review**

  A. Federal Rule of Civil Procedure 12(b)(1)

The party who seeks to invoke a court's jurisdiction bears the burden of establishing that jurisdiction.  *Thompson v. Cnty. of Franklin*, 15 F.3d 245, 249 (2d Cir. 1994) (citing *Warth v. Seldin*, 422 U.S. 490, 518 (1975)).  To survive a motion brought under Rule 12(b)(1), a plaintiff must allege facts demonstrating that the plaintiff is a proper party to seek judicial resolution of

the dispute. *Id*. "A district court properly dismisses an action under Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction if the court 'lacks the statutory or constitutional power to adjudicate it,'" such as when "the plaintiff lacks constitutional standing to bring the action." *Cortlandt Street Recovery Corp. v. Hellas Telecommunications*, 790 F.3d 411, 416–17 (2d Cir. 2015) (internal citations omitted). "The plaintiff bears the burden of 'alleg[ing] facts that affirmatively and plausibly suggest that it has standing to sue.'" *Id*. (internal citations omitted). "[S]tanding cannot be 'inferred argumentatively from averments in the pleadings,' but rather 'must affirmatively appear in the record.'" *Martinez v. Malloy*, 350 F. Supp. 3d 74, 84 (D. Conn. 2018) (citing *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 232 (1990)).

In considering a Rule 12(b)(1) motion to dismiss for lack of standing, the Second Circuit construes "the complaint in [the] plaintiff's favor and accept[s] as true all material factual allegations contained therein." *Donoghue v. Bulldog Inv'rs Gen. P'ship*, 696 F.3d 170, 173 (2d Cir. 2012); *see also Wiltzius v. Town of New Milford*, 453 F. Supp. 2d 421, 429 (D. Conn. 2006) ("In considering such a motion, the court accepts the factual allegations alleged in the complaint as true and draws all inferences in the plaintiff's favor.") (internal citations omitted). In deciding a Rule 12(b)(1) motion, courts may refer to evidence outside the pleadings. *Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 145, 146 (2d Cir. 2011) (per curiam).

## II.     Background

### A. Factual Allegations[1]

After the Connecticut Supreme Court ruled in *Sheff v. O'Neill* that the Connecticut Constitution required the state to provide students a "substantially equal educational

---

[1] The facts are drawn from the complaint, and for purposes of the present motion, I assume them to be true and draw all reasonable inferences in CTPU's favor. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009).

opportunity," the parties to that case negotiated a settlement that imposed a 75% cap on Black and Hispanic student enrollment in Hartford and surrounding interdistrict magnet schools. *Sheff v. O'Neill*, 238 Conn. 1, 23 (1996); Compl., Doc. No. 1, at ¶ 11.  Enacted in 2017, Public Act 17-172 ("the Act") applied that quota to all interdistrict magnet schools throughout the state. Compl., Doc. No. 1, at ¶¶ 13, 15.  Under the Act, interdistrict magnet schools must reserve at least 25% of their seats for "reduced-isolation student[s]." *Id*. at ¶¶ 1, 13.  A "reduced-isolation student" is defined as a student who "[i]s Native American, Asian, Alaska Native, Native Hawaiian, Other Pacific Islander, White and/or Two or More Races white and Asian (any combination other than Black/African American or Hispanic)" and "[i]s not Black/African American, Hispanic and/or Two or More Races (any combination of Black/African American or Hispanic)." Ex. 1 to Compl., Doc. No. 1, at 1.

Since the Act's statewide implementation, Black and Hispanic students have been "denied admission to interdistrict magnet schools in favor of white and Asian students." Compl., Doc. No. 1, at ¶ 21.  In addition, at least one interdistrict magnet school has closed. *Id*. at ¶ 16. Specifically, Dr. Cortlandt V.R. Creed Health & Sports Sciences High School, an interdistrict magnet school in New Haven, was closed permanently after incurring over $100,000 in sanctions for failing to comply with the quota. *Id*.

Established in 2011 by Gwendolyn Samuel, CTPU works to ensure that "parents, guardians, and families are connected with the educational resources and support system to protect their child's educational rights," and "collaborates with parents, teachers, and educational advocates across Connecticut to engage decision-makers to achieve educational reform." *Id*. at ¶ 6.  CTPU's mission is "to advocate for equal educational opportunity for all children in Connecticut" and to "prevent children's skin color from determining their educational

opportunities." *Id*. at ¶¶ 20, 22.  CTPU has "hosted community events, information sessions, bus tours, and other events in order to educate the public about the statewide racial quota's harmful effects."  *Id*. at ¶ 6.

    B.  Procedural History

On February 20, 2019, CTPU filed the instant complaint against Wentzell, Taylor, Lamont, and Tong in their official capacities.  Compl., Doc. No. 1.  As set forth in its complaint, CTPU challenges the Act's implementation pursuant to 42 U.S.C. § 1983 on the ground that it violates the Fourteenth Amendment's Equal Protection Clause.  *Id*. at ¶¶ 3–4.  CTPU specifically alleges that "[t]he decision to extend the racial quota to all magnet schools in the state was not required to comply with the *Sheff* decision," and that, in extending that quota, Defendants "are discriminating on the basis of race in violation of the Fourteenth Amendment."  *Id*. at ¶¶ 14, 30.  It seeks permanent injunctive relief enjoining the enforcement of the Act, as well as a declaratory judgment that the Act is unconstitutional.  *Id*. at ¶¶ 18–33.

Defendants filed a motion to dismiss CTPU's complaint on March 26, 2019 on the basis that CTPU lacks standing.  Mot. to Dismiss, Doc. No. 31.  CTPU opposed the motion on April 16, 2019, and Defendants replied on April 30, 2019.  *See* Doc. Nos. 35, 37.  I heard oral argument on December 5, 2019.

**III.  Discussion**

A plaintiff must establish that it has standing to bring the cause of action that it asserts. *See Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016).  The doctrine of standing "limits the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong."  *Id.*  As opposed to a "technical rule intended to keep aggrieved parties out of court" or a "test of substantive rights[,]" standing is a "practical concept designed to ensure that courts and

4

parties are not vexed by suits brought to vindicate nonjusticiable interests." *Econ. Enterprises, Inc. v. T.D. Bank N.A.*, 2011 WL 446891, at *2 (D. Conn. Feb. 3, 2011) (internal citations omitted).

To establish the constitutional minimum of standing, a plaintiff must satisfy three elements. *Field Day, LLC v. County of Suffolk*, 463 F.3d 167, 175 (2d Cir. 2006) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). First, a plaintiff must establish that it "has sustained an 'injury in fact' which is both 'concrete and particularized' and 'actual or imminent' . . . ." *Cortlandt Street Recovery Corp. v. Hellas Telecommunications*, 790 F.3d 411, 417 (2d Cir. 2015) (quoting *Lujan*, 504 U.S. at 560). A concrete injury is one that "actually exist[s]." *Spokeo*, 136 S. Ct. at 1548. "For an injury to be 'particularized,' it 'must affect the plaintiff in a personal and individual way.'" *Id.* (quoting *Lujan*, 504 U.S. at 560 n.1). The "mere possibility of future injury, unless it is the cause of some present detriment, does not constitute hardship." *Simmonds v. INS*, 326 F.3d 351, 360 (2d Cir. 2003).

Second, the plaintiff must establish a "causal connection between the injury and the conduct complained of . . . ." *Field Day, LLC*, 463 F.3d at 175 (quoting *Lujan*, 504 U.S. at 560–61). The injury must be "fairly . . . trace[able] to the challenged action of the defendant, and not . . . the result [of] the independent action of some third party not before the court." *Id*. (quoting *Lujan*, 504 U.S. at 560). Finally, "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id*. (quoting *Lujan*, 504 U.S. at 561).

The Supreme Court has recognized that "organizations are entitled to sue on their own behalf for injuries they have sustained." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 n.19 (1982) (internal citation omitted). To establish standing as an organization, the organization must independently satisfy the Article III standing requirements, and must specifically establish the

following elements: "(i) an imminent 'injury in fact' to itself as an organization (rather than to its members) that is 'distinct and palpable'; (ii) that its injury is 'fairly traceable' to enforcement of the [law at issue]; and (iii) that a favorable decision would redress its injuries." *Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 109–10 (2d Cir. 2017).

In the case at bar, CTPU has failed to plead organizational standing because it has not plausibly alleged that it suffered an injury "fairly traceable" to the Act or to actions of the defendants.[2] As a preliminary matter, the complaint is wholly devoid of factual allegations that the Act directly interfered with CTPU's ability to carry out its current activities. CTPU rests its standing argument on the conclusory assertion that the Act "compels CTPU to expend a significant amount of time and resources opposing the unconstitutional cap" at the expense of engaging in other activities, such as testifying before the Connecticut Board of Education on school safety issues or supporting special needs students at IEP meetings. Compl., Doc. No. 1, at ¶ 22; Samuel Dec., Doc. No. 36, at ¶¶ 11, 13.

But the complaint pleads no facts showing how the Act "compelled" CTPU to forgo those activities and oppose the quota instead. It does not allege, for example, how the Act rendered it more difficult or costly for CTPU to advocate on behalf of special needs students at IEP meetings, and how CTPU therefore needed to mitigate the Act's adverse effects in order to support students as it had before. *Young Advocates for Fair Educ. v. Cuomo*, 359 F. Supp. 3d 215, 235 (E.D.N.Y. 2019) ("[T]he appropriate standing inquiry is whether the challenged state law, because of its detrimental effect on the community served by the organization (or upon the

---

[2] CTPU clarified in its opposition that it is not asserting standing as a student, as an organization comprised of students, or as a membership organization. Opp. to Mot. to Dismiss, Doc. No. 35, at 3. Accordingly, I do not address the issue of associational standing.

organization itself), will *require* the organization to devote resources remediating the law's harmful effects in a way that limits its ability to provide the same level of services as before.") (emphasis added).  CTPU's summary assertion at oral argument that the Act forced CTPU to perform additional work in terms of IEP participation likewise does not compel a conclusion to the contrary.  *Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 145–46 (2d Cir. 2011) (per curiam) (noting that a plaintiff "must allege facts that affirmatively and plausibly suggest that it has standing to sue" and that courts "need not 'credit a complaint's conclusory statements without reference to its factual context'") (internal citations omitted).

Moreover, as CTPU's counsel and Samuel discussed at oral argument, Samuel received calls from parents—none of whom are parties in this suit—whose children were denied access to magnet schools.  Some of those parents raised questions about how to navigate the law and requested that CTPU host community events.  CTPU's counsel stated that those requests—not the Act itself—drove CTPU to decide to redirect its resources to opposing the Act.

Of course, CTPU's failure to allege a harm directly attributable to the Act is not fatal to its argument.  *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 59 (2d Cir. 2016) ("[A] plaintiff's injury need not be 'directly' attributable to a defendant").  "A defendant's conduct that injures a plaintiff but does so only after intervening conduct by another person, may suffice for Article III standing."  *Chevron Corp. v. Donziger*, 833 F.3d 74, 121 (2d Cir. 2016) (internal citations omitted).  But the connection between CTPU's alleged injuries and the Act is still far too tenuous to confer standing.

Causation is not met when a plaintiff's injury arises from "the independent action of some third party."  *Bennett v. Spear*, 520 U.S. 154, 169 (1997) (quoting *Lujan*, 504 U.S. at 560–61) (emphasis omitted).  Although a plaintiff bears only a "relatively modest" burden to show

causation, *Bennett*, 520 U.S. at 171, that burden is harder to meet where, as here, "traceability 'depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or predict.'" *State v. United States Dep't of Commerce*, 315 F. Supp. 3d 766, 785 (S.D.N.Y. 2018); *Lujan*, 504 U.S. at 562 ("[W]hen the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily 'substantially more difficult' to establish."). In that instance, "it becomes the burden of the plaintiff to adduce facts showing that those choices have been or will be made in such manner as to produce causation." *Lujan*, 504 U.S. at 562; *see also, e.g.*, *Bennett*, 520 U.S. at 169 (concluding that a party may meet the standing requirement if it suffered an "injury produced by determinative or coercive effect upon the action of someone else") (quoting *Lujan*, 504 U.S. at 560–61).

      CTPU has not carried that burden here. CTPU is not the object of the Act, and the complaint does not allege that parents whose children were impacted by the Act were forced to seek assistance from CTPU. Nor does the complaint proffer any facts showing that the parents' calls "coerc[ed]" or otherwise compelled CTPU to expend resources to oppose the Act. *Bennett*, 520 U.S. at 169. CTPU was free to decline the parents' requests at no cost to the organization; that it opted to do otherwise does not grant it standing.

      Those defects render CTPU a far cry from other entities that courts have determined to have standing and distinguish the instant case from the cases on which CTPU relies. *See, e.g.*, *Student Members of Same v. Rumsfeld*, 321 F. Supp. 2d 388, 397 (D. Conn. 2004) (holding that the harm suffered by Yale Law School student organizations was "fairly traceable" to the Department of Defense's regulation denying federal funding to universities that prevented military recruitment on campus, because the "threat" of no funding had "forced" Yale to suspend

its nondiscrimination policy, and that suspension allegedly violated, *inter alia*, the students' equal protection rights).

CTPU cites *Havens Realty Corp. v. Coleman* in support of its claimed standing.  In that case, three individuals and non-profit Housing Opportunities Made Equal ("HOME"), which runs a housing counseling service and investigates and refers housing discrimination complaints, sued a real estate firm for violating the Fair Housing Act.  The complaint alleged that the defendant steered members of racial groups to buildings occupied primarily by members of their respective racial groups.  455 U.S. 363, 366–68 (1982).  In determining that HOME had standing, the Supreme Court reasoned that the "petitioners' steering practices have perceptibly impaired HOME's ability to provide counseling and referral services for low- and moderate-income homeseekers."  *Id*. at 376, 379.  Significantly, the Court relied on the allegation that HOME had "been frustrated by defendants' racial steering practices in its efforts to assist equal access to housing through counseling and other referral services" and "*had to* devote significant resources to identify and counteract" the defendant's steering practices.  *Id*. at 369, 379 (emphasis added).

Similarly, in *Ragin v. Harry Macklowe Real Estate Co*., the Open House Center ("OHC")—a nonprofit dedicated to eliminating housing discrimination that provided information at community seminars about how to fight such discrimination—challenged a real estate company's placement of advertisements for residential apartments, which had only displayed white models, in *The New York Times*.  6 F.3d 898, 901–02, 905 (2d Cir. 1993).  In holding that the OHC had standing, the Second Circuit explained that the OHC was "forced" to "devote significant resources to identify and counteract" the advertising practices at issue, to "the

detriment of their 'efforts to [obtain] equal access to housing through counseling and referral services.'" *Id*. at 905 (citing *Havens*, 455 U.S. at 379).

Likewise, in *Nnebe v. Daus*, the Second Circuit concluded that the New York Taxi Workers Alliance ("NYTWA") had standing to challenge a NYC Taxi and Limousine Commission policy that suspended a driver's license without a hearing if he or she was charged with a certain crime. 644 F.3d 147, 150 (2d Cir. 2011). The union had expended monetary resources to support its own members who were facing suspension by "providing initial counseling, explaining the suspension rules to drivers, and assisting drivers in obtaining attorneys." *Id.* at 151, 157. Because the very purpose of a union is to represent the interests of its members, it necessarily follows that the union was required to provide such assistance to its members who were facing suspension; it did not choose to do so simply because it disagreed with the policy. I cannot reach that same conclusion here.

*Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay* and *New York State Citizens' Coal. for Children v. Poole*, other cases to which the parties cite, concerned the first prong of standing—injury—and therefore do not inform my causation analysis here. 868 F.3d 104, 110–11 (2d Cir. 2017); 922 F.3d 69, 75 (2d Cir. 2019).

CTPU also relies heavily on the Southern District of New York's reasoning in *Christa McAuliffe Intermediate Sch. PTO, Inc. v. de Blasio*, 364 F. Supp. 3d 253 (S.D.N.Y.), *aff'd on other grounds*, 788 F. App'x 85 (2d Cir. 2019). In that case, three organizations—a private organization comprised of parents and teachers, a nonprofit dedicated to "furthering Chinese-American interests," and a nonprofit "formed to further education rights for Asian-Americans"— challenged New York City's proposed changes to the admissions criteria for its eight specialized public high schools. *Id*. at 261, 270, 272. The defendants moved to dismiss, arguing, *inter alia*,

10

that the organizations did not enjoy standing because they had not sufficiently alleged an injury in fact. *Id*. at 272.  The court disagreed, reasoning that "all three have dedicated resources to counteracting Defendants' allegedly discriminatory actions." *Id*.  The court elaborated that the organizations "expended resources outside of this litigation organizing public events, speaking to press, and lobbying officials to combat the proposed changes," and that those resources "could have gone towards other activities furthering the organizations' goals." *Id*.

That decision, too, addressed only the injury prong of standing and is therefore not instructive here.  *Id.* ("Defendants argue that the three organizational plaintiffs all lack standing because none have sufficiently alleged an injury in fact.").  Moreover, the *Christa* case is distinguishable for the additional reason that the organizations were seeking a preliminary injunction prohibiting New York City from implementing the proposed changes, *id*. at 261, and when "a party seeks review of a prohibition prior to its being enforced, 'somewhat relaxed standing' rules apply." *Centro*, 868 F.3d at 110 (quoting *Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682, 689 (2d Cir. 2013)).  Because CTPU is challenging an existing racial quota that has been implemented, that more relaxed standard does not apply here.

To the extent the *Christa* decision is otherwise analogous, I respectfully decline to follow it.  If I were to accept CTPU's arguments, it would be difficult to conceive of an education-related law that it could not challenge in court given the broad scope of CTPU's mission.  *Young Advocates for Fair Educ.*, 359 F. Supp. 3d at 231.  As a general matter, it would permit any organization that disagreed with a law to bring a suit merely because it chose to redirect its time and resources to opposing that very law.  *Ctr. for Food Safety v. Price*, 2018 WL 4356730, at *5 (S.D.N.Y. Sept. 12, 2018) ("[T]o allow standing based on these allegations alone would mean that any entity that spends money on an issue of particular interest to it would have standing,

11

which would in turn contravene the principle that an entity's 'mere interest in a problem' cannot support standing."). In that case, individuals who may otherwise not have standing—and particularly those with larger bank accounts—could manufacture standing simply by forming an organization that expends money and time opposing a law. *Young Advocates for Fair Educ.*, 359 F. Supp. 3d at 231 ("Individual persons cannot obtain judicial review of otherwise non-justiciable claims simply by incorporating, drafting a mission statement, and then suing on behalf of the newly formed and extremely interested organization.") (quoting *National Treasury Employees Union v. United States*, 101 F.3d 1423, 1429 (D.C. Cir. 1996)).

Not only would that outcome erode Article III's standing requirements and lead to a flood of litigation, but it would also raise both separation of powers and federalism concerns, on which the law of Article III standing is built. *Juvenile Matters Trial Lawyers Assn. v. Judicial Dept.*, 363 F. Sup. 2d 239, 244 (D. Conn. 2005) ("The constitutional standing requirement promotes separation of powers among the different branches of government, the system of federalism which leaves certain authority to state governments, judicial efficiency, and, finally, fairness"). Both of those principles are particularly at play here because the challenge is to the action of a state's political branch.

For all the foregoing reasons, I conclude that CTPU has not sufficiently pled standing.

## IV.    Conclusion

The motion to dismiss is therefore **granted**. Because the complaint is dismissed for lack of standing, it is dismissed without prejudice. *Carter,* 822 F.3d at 54. The Clerk is directed to enter judgment and close the case.

So ordered.

Dated at Bridgeport, Connecticut, this 26th day of May 2020.

/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge